IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ANTHONY R. BASS,<br><br>            Plaintiff,<br><br>    v.<br><br>WASHINGTON COUNTY SHERIFF PATRICK J. GARRETT, individually and in his official capacity; ERROLL K. MCCREA, individually and in his official capacity; MATTHEW D. FROHNERT, individually and in his official capacity; and WASHINGTON COUNTY,<br><br>            Defendants. | Case No.: 3:23-cv-00084-AN<br><br><br>OPINION AND ORDER |

Plaintiff Anthony R. Bass alleges that defendants Patrick J. Garrett, Erroll K. McCrea, Matthew D. Frohnert, and Washington County unlawfully retaliated against plaintiff for blowing the whistle on improper police practices at an outside organization. After reviewing the parties' pleadings, the Court finds that oral argument will not help resolve this matter. *See* Local R. 7-1(d). Defendants moved for summary judgment on all of plaintiff's claims. For the reasons stated herein, defendants' motion is GRANTED.

## LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). Material facts are those which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When a moving party demonstrates the absence of a genuine dispute as to any material fact, the nonmoving party that bears the burden at trial must show in response that there is evidence creating a

1

genuine dispute as to any material fact. *Rivera*, 395 F.3d at 1146 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

## BACKGROUND

**A.      Factual Background**

1.       *Plaintiff's Personal and Professional History*

Plaintiff Anthony R. Bass is a grandfather and former Sergeant for the Washington County Sheriff's Office ("WCSO"). Compl., ECF 1, ¶¶ 4, 19.[1]  His career at WCSO spanned more than two decades, during which time he received numerous assignments and promotions. *Id.* ¶ 11.  He spent ten years in the patrol division, where he rose to the rank of Corporal, and spent additional time in the Investigations Division, where he was promoted to Detective. *Id.*; Dep. of Anthony R. Bass ("Bass Dep."), ECF 43-1, at 4[2]; Dep. of Errol K. McCrea ("McCrea Dep."), ECF 43-5, at 5.  Eventually, he was promoted to Sergeant and placed on special assignment to the WCSO Professional Standards Unit ("PSU"), a unit that interacts regularly with partner agencies and, at times, conducts interagency investigations. Compl. ¶ 12; MCrea Dep. 6.

In June 2020, officers from the Beaverton Police Department ("BPD") arrested plaintiff's daughter in response to a domestic dispute at her home. Compl. ¶¶ 20-21.  No charges were ultimately pursued. *Id.* ¶ 22.  A month later, the daughter's husband—plaintiff's son in law—yelled at one of their children, causing the child to run into a wall and injure their teeth. *Id.* ¶ 25.  Plaintiff, worried for his grandchild and cognizant of his duties as a mandatory reporter, notified the Oregon Department of Human Services ("DHS") of this incident. *Id.* ¶¶ 24-25.  He reported this as a possible instance of child abuse. *Id.* ¶ 25.

The following year, in October 2021, plaintiff's son-in-law hit one of his children (plaintiff's

---

[1] The Court cites to certain allegations made in plaintiff's complaint to which no party has filed any evidence to the contrary or otherwise disputed the truth of.

[2] All references to ECF pagination.

grandchild).  *Id.* ¶ 26.  Plaintiff learned of this incident on December 11, 2021, and promptly reported it to DHS as another potential incident of abuse.  *Id.* ¶ 27.

The next day, on December 12, plaintiff contacted the Washington County non-emergency dispatch line to again report the incident and "asked the dispatcher if the incident could be referred to WCSO" for investigation.  *Id.*  The dispatcher told plaintiff that the incident would be referred to BPD because it occurred in BPD's jurisdiction.  *Id.* ¶ 28.  Plaintiff then texted Commander John Bennett and Lieutenant Joe Noffsinger to let them know about his call to dispatch.  Confidential Decl. of Andrew Mittendorf Supp. Pl. Resp. ("Mittendorf Confid. Decl."), ECF 49, at Ex. 1 at 1.  Both responded sympathetically.  *Id.* at 1-2.

2.        *Plaintiff's Communications Regarding the Child Abuse Investigation*

On that same day, December 12, 2021, BPD Sergeant Stephen K. Finch returned plaintiff's dispatch call.  Compl. ¶ 29; Bass Dep. 7.  Plaintiff answered from his personal cell phone while off duty, representing that he was speaking to Sgt. Finch as a father.  Compl. ¶ 32; Bass Dep. 7.  Plaintiff told Sgt. Finch about his daughter's arrest and his concerns for his grandchildren.  Compl. ¶ 29; Bass Dep. 7; Mittendorf Confid. Decl. Ex. 4 at 4.  He told Sgt. Finch that he wanted WCSO to handle the investigation because he believed BPD had failed to properly investigate his family's earlier incidents.  Bass Dep. 7; Mittendorf Confid. Decl. Ex. 4 at 4.  More specifically, he said that BPD made a mistake in arresting his daughter in the summer of 2020 and that BPD officers were "class-less" in how they handled the arrest.[3]  Bass Dep. 7; Mittendorf Confid. Decl. Ex. 4 at 9.  Plaintiff also described the BPD officer's arrest report as being "shit."  Bass Dep. 11; Mittendorf Confid. Decl. Ex. 4 at 9.  Sgt. Finch told plaintiff that he needed to discuss plaintiff's request with his lieutenant and said he would ask if the matter could be transferred to the Hillsboro or Tigard Police Departments.  Bass Dep. 7; Compl. ¶ 31.

Plaintiff described the call as "a personal conversation as a father, reporting [his] concerns and frustrations."  Bass Dep. 7.  Sgt. Finch was a little "bothered" by the remarks but understood plaintiff's

---

[3] Plaintiff's statements on the call are based on a description provided by Sgt. Finch during an internal investigation.  Plaintiff has not disputed the accuracy of these statements and submitted the document containing these statements with his response.  *See* Mittendorf Confid. Decl. Ex. 4.

concern for his daughter and grandchildren.  Decl. of Andrew Mittendorf Supp. Pl. Resp. ("Mittendorf Decl."), ECF 48, at Ex. 5 at 6-7.  Sgt. Finch did not think plaintiff's behavior was unreasonable, did not feel any animosity towards plaintiff or WCSO, and did not file a complaint about plaintiff.  *Id.* at Ex. 5 at 6-7, 11-12.

After the call, Sgt. Finch reached out to WCSO Sergeant Anthony Morris.  Compl. ¶ 30; Mittendorf Confid. Decl. Ex. 4 at 4.  Sgt. Morris believed it would be a conflict of interest for WCSO to investigate the incident involving plaintiff's grandchildren.  Compl. ¶ 30; Mittendorf Confid. Decl. Ex. 4 at 4.  Sgt. Morris also consulted with BPD Lieutenant Ed Rawlinson, who agreed it would be a conflict of interest for WCSO to take over the investigation.  Mittendorf Confid. Decl. Ex. 4 at 4.  After speaking with Lt. Rawlinson, Sgt. Morris left a message for Sgt. Finch explaining that WCSO would not be taking over the investigation.  *Id.*  Sgt. Morris then called plaintiff to explain that WCSO would not be getting involved because there was a conflict of interest.  *Id.*  Sgt. Morris said that he tried to offer plaintiff some suggestions during this call, but that plaintiff, who was "emotional and understandably upset," hung up the phone.  *Id.* at Ex. 4 at 5.

Sgt. Morris then emailed the WCSO patrol sergeants to inform them of the situation.  Mittendorf Confid. Decl. Ex. 2.  The email stated, in relevant part:

> I spoke with Sgt Finch about an investigation regarding Sgt Bass' daughter and grandkids. BPD conducted an investigation in June of this year in regards to Sgt Bass' daughter and DHS got involved to some extent regarding the kids. Sgt Bass was requesting WCSO take over the investigation, or conduct a separate investigation regarding his grandkids. I spoke with Lt Rawlinson . . . [whose] opinion was WCSO should not be involved because of the possible conflict of interest, which I agreed with. . . . I called Sgt Bass and informed him of the decision that was made. The conversation was professional, but quick.

*Id.*

Later that day, plaintiff filed a complaint with Human Resources ("HR") analyst Dale Yee about Sgt. Morris's email.  *See* Mittendorf Confid. Decl. Ex. 3.  Plaintiff told Yee about the DHS report and mentioned that he had "requested WCSO to investigate because of some unprofessionalism" that occurred during his daughter's prior arrest, and because he felt BPD conducted a "poor investigation" into the earlier

4

incident. *Id.* at 1. Plaintiff then told Yee about the "Pass Along email sent out by Sgt. Morris to all Patrol Sergeants and Patrol Admin Staff." *Id.* Plaintiff was upset about this email because he objected to his "name and private family business [being] put in a pass along as if [he was] some disgruntled and disturbed employee to watch out for." *Id.* He also noted that Lt. Rawlinson did not try to get plaintiff's "side of the issue or to check in on" him before sending the email, and that he was "disappointed by [Lt.] Rawlinson's lack of concern and respect." *Id.*

The following day, December 13, Cmdr. Bennett told plaintiff that it would be a conflict of interest for WCSO to handle the investigation and said he would contact a friend at the Hillsboro Police Department ("HPD") instead. *See* Compl. ¶ 38; Pl. Resp. 10. On December 14, BPD Sergeant Mark R. Groshong told plaintiff that the abuse investigation was being referred to HPD. Compl. ¶ 39. Plaintiff told Cmdr. Bennett that "he did not believe a conflict of interest would exist if WCSO investigated the incident since no WCSO employee was the subject of the investigation and since Plaintiff would not be investigating the incident himself." *Id.* ¶ 40. Plaintiff's case transfer request was ultimately denied for presenting a conflict of interest. *See* Mittendorf Confid. Decl. Ex. 4 at 4.

3.        *Plaintiff's Data Request*

On December 14, 2021, plaintiff initiated a WCSO data request. *See* O'Kasey Decl. Ex. 3, ECF 43-9, at 2. Plaintiff asked a member of the WCSO team if there was "a way to search call history for any calls for service from a citizen in another police jurisdiction calling and requesting that WCSO service the call." *Id.* Becky Carlton, a member of the Data Integrity Group, responded the next morning. *Id.*; Compl. ¶ 41. Plaintiff told Carlton he was "looking for verification by numbers that WCSO has serviced calls for citizens from another jurisdiction who have specifically requested WCSO service." O'Kasey Decl. Ex. 3 at 1. When interviewed about this request later, plaintiff stated that the information "was not something [he] needed . . . for personal use," but that he wanted "hard numbers" to "show [Cmdr.] Bennett that a citizen can call in and ask for another jurisdiction to investigate." Mittendorf Confid. Decl. Ex. 4 at 7. He said that this idea came from his conversations with Cmdr. Bennett and Lt. Noffsinger, and from his "role as an investigator" and that "he had both a professional and personal reason for requesting the information."

*Id.* at Ex. 4 at 7-8.  Several hours plaintiff sent the initial email, and without having received any of the requested information, plaintiff second Carlton a second email withdrawing his original request.  Plaintiff wrote, "[p]lease disregard my request Becky.  So sorry to waste any of your time."  O'Kasey Decl. Ex. 3 at 1.  None of the data was ultimately sent to plaintiff.  *See* Mittendorf Confid. Decl. Ex. 4 at 8.

    4.      *Plaintiff's Service-Related Inquiry Memo*

On December 15, 2021, Cmdr. Bennett initiated a Service-Related Inquiry Memo ("SRIM")[4] into plaintiff's data request and temporarily suspended plaintiff from his PSU duties while the SRIM investigation was pending.  Dep. of John D. Bennett ("Bennett Dep."), ECF 43-2, at 3; Compl. ¶ 46.  The SRIM accused plaintiff of two policy violations: the "Protection of Records" policy and the "Unauthorized Use of Sherriff's Office Information" policy.  Mittendorf Confid. Decl. Ex. 4 at 2.  Cmdr. Bennett assigned Lieutenant Timothy P. Tannenbaum to be the primary investigator.  *Id.* at 1.

Lt. Tannenbaum found that while plaintiff had made a data request on December 14, plaintiff had not actually received or accessed any of the requested data.  O'Kasey Decl. Ex. 2, ECF 43-8, at 8.  However, Lt. Tannenbaum's investigation also led him to learn about plaintiff's earlier conversation with Sgt. Finch. *See id.*

On January 27, 2022, Lt. Tannenbaum spoke with Sgt. Finch about his phone call with plaintiff. *Id.*  Sgt. Finch told Tannenbaum that he was "'taken aback'" by some of plaintiff's statements, including plaintiff's "'[n]ot so friendly comments'" about BPD.  *Id.* at Ex. 2 at 8-9.  Specifically, Sgt. Finch said that plaintiff called BPD "'[c]lass-less'" in their handling of plaintiff's daughter's arrest, and that the resulting incident report was "'[s]hit.'"  *Id.* at Ex. 2 at 9.  However, Sgt. Finch also reported that plaintiff seemed to "'[c]ome around at the end'" of the call.  *Id.*

After speaking with Sgt. Finch, Lt. Tannenbaum added two additional policy violation accusations to plaintiff's SRIM: a "Professional Conduct" violation and a "Courtesy and Respect" violation.  Compl. ¶¶ 48-49.  Lt. Tannenbaum then investigated these possible violations further, first by reviewing the CAD

---

[4] A SRIM is "a lower level investigation into personnel complaints" that is considered less serious than an internal affairs investigation.  Dep. of Matthew D. Frohnert ("Frohnert Dep."), ECF 43-6, at 3.

calls from the December 12 incident and then by interviewing plaintiff.  O'Kasey Decl. Ex. 2 at 9-10. During the interview, plaintiff told Lt. Tannenbaum he did not remember exactly what he said to Sgt. Finch, but that he "'probably did'" say the report was "'shit.'"  *Id.* at Ex. 2 at 10.  Plaintiff also told Lt. Tannenbaum that he had never actually seen the report and was only given information about it by his daughter.  *Id.* Shortly after the interview ended, plaintiff called Lt. Tannenbaum back and clarified that he did not remember specifically saying the report was "shit" and that he could not imagine himself saying that to another officer.  *Id.*  Instead, plaintiff believed that he likely said the report was "incomplete or something along those lines."  *Id.*  Lt. Tannenbaum then reached out again to Sgt. Finch who confirmed his memory of plaintiff's remarks.  *Id.*

Lt. Tannenbaum submitted his SRIM report on February 9, 2022.  *Id.* at Ex 2.  He found that plaintiff made a database request "related to a personal situation," but that plaintiff recognized that "the professional and personal aspects [of the request] were intertwined."  *Id.* at Ex. 2 at 10.  Although plaintiff "took substantial steps to obtain the requested information," plaintiff ultimately "canceled the request for information before any searches were conducted or information was obtained."  *Id.*  Because plaintiff did not view or obtain any of the requested information, Lt. Tannenbaum did not sustain the alleged policy violations regarding "Protection of Records" and "Unauthorized Use of Sherriff's Office Information."  *Id.* at Ex. 2 at 1, 10.

However, Lt. Tannenbaum did sustain the two later-added policy violations regarding "Professional Conduct" and "Courtesy and Respect."  *Id.* at Ex. 2 at 1.  He found that plaintiff "made statements that were unnecessary and harsh while speaking with BPD Sgt. Finch" and that, although the comments "were made in an off-duty capacity," plaintiff "had identified himself [to Sgt. Finch] as a WCSO sergeant, so his connection to the WCSO was clear."  *Id.* at Ex. 2 at 10.  Lt. Tannenbaum found that plaintiff's "conduct, in the mind of a reasonable person, was damaging to the positive public image, integrity, and reputation of WCSO" and that plaintiff's comments "could have had an undermining effect on the relationship between BPD and WCSO.  *Id.* at Ex. 2 at 10-11.  Lt. Tannenbaum specifically found that plaintiff used "inappropriate, indecent, condescending, and unnecessarily harsh language" in the

7

conversation with Sgt. Finch. *Id.* at Ex. 2 at 11. Lt. Tannenbaum did not make any disciplinary recommendations or decisions. Dep. Timothy P. Tannenbaum ("Tannenbaum Dep."), ECF 43-7, at 3.

5.      *Plaintiff's Oral Reprimand, Plaintiff's Reassignment, and the Position Posting*

Lieutenant Matthew Frohnert, who replaced Cmdr. Bennett in overseeing the PSU, decided to issue plaintiff an oral reprimand in response to the SRIM and to reassign plaintiff from PSU to the patrol division. Compl. ¶¶ 50, 52; Frohnert Dep. 4. Lt. Frohnert said that he made this decision because the PSU interacts with partner agencies on a regular basis, and he was afraid that plaintiff's interaction with BPD could negatively impact those working relationships. *Id.* Chief Deputy Errol K. McCrea reviewed the recommendation and agreed with the assessment. *Id.* On March 2, 2022, Lt. Frohnert issued plaintiff an oral reprimand. Mittendorf Confid. Decl. Ex. 7.

On March 3, 2022, plaintiff emailed Lt. Frohnert and Chief Dep. McCrea to challenge the decision. *Id.* at Ex. 8. Plaintiff wrote that the SRIM investigation was incomplete because some relevant parties had not been interviewed. *Id.* at Ex. 8 at 2. Plaintiff also wrote that the report inappropriately took Sgt. Finch's word over plaintiff's since there was no recording of plaintiff's phone call with Sgt. Finch. *Id.* Lt. Frohnert agreed to re-review plaintiff's conversation with Sgt. Finch and asked plaintiff who else should be interviewed. *Id.* at Ex. 8 at 1.

Two days later, on March 5, plaintiff sent a letter to Shf. Garrett challenging (1) the SRIM's findings, and (2) plaintiff's reassignment. *Id.* at Ex. 9. Plaintiff told Shf. Garrett that he was being let down by WCSO and that he felt he was being retaliated against. *Id.* at Ex. 9 at 1-2. Shf. Garrett asked Chief Dep. McCrea to review the letter and consider the points raised. O'Kasey Confid. Decl. Ex. 8.

On March 18, Chief Dep. McCrea sent an email to the WCSO sergeants entitled "PSU Sgt assignment (temporary)."[5] Mittendorf Confid. Decl. Ex. 10 at 4. In the email, Chief Dep. McCrea wrote

---

[5] Plaintiff complained to Shf. Garrett that Chief Dep. McCrea's email revealed that plaintiff was the subject of the investigation because a different officer was included in the email's "cc" line while plaintiff was not. Mittendorf Confid. Decl. Ex. 10 at 3. In response to plaintiff's complaint, Chief Dep. McCrea wrote that he "cc'ed [the other officer] because he was not part of the patrol sergeants email group" and that he did not cc plaintiff because he "knew [plaintiff was] already part of that email group." *Id.* at Ex. 10 at 1. Plaintiff is listed in the "to" line as one of the primary email recipients. *Id.* at Ex. 10 at 4.

that he was giving "a heads up on a pending special assignment (PSU Sgt) that will become available (temporary) until an internal investigation is complete" and that it would later be decided whether "the temporary assignment [would] become a full-time assignment." *Id.* He described the PSU position as "a great opportunity for the right person if you want to learn more about Internal Affairs investigations" and wrote that the "position can help prepare you for other opportunities within the Sheriff's Office." *Id.*

On March 24, Chief Dep. McCrea responded to plaintiff's letter to Shf. Garrett, and stated his agreement with the SRIM's findings. O'Kasey Decl. Ex. 9, ECF 43-11. Chief Dep. McCrea wrote that plaintiff's reassignment was "reasonable and appropriate" and noted that the relevant policy "provides that staff serve in specialized duty assignments like PSU at the discretion or pleasure of the Sheriff," meaning that plaintiff could have been reassigned regardless of the SRIM's outcome. *Id.* at Ex. 9 at 2. Chief Dep. McCrea concluded that plaintiff was 'not tactful, professional, or courteous during [his] interactions with Sgt. Morris [and] Sgt. Finch." *Id.*

6.      *Plaintiff's Resignation*

On April 5, 2022, plaintiff tendered his resignation. *Id.* at Ex. 12. Plaintiff told Shf. Garrett that he felt "let down beyond repair," that he had experienced "[i]njustices" including "retaliation," and that he "no longer [felt] safe working for an organization who so quickly and without proper process leaves its employees vulnerable to these kinds of assaults and character assassination." *Id.*

B.      **Procedural Background**

Plaintiff filed this lawsuit on January 18, 2023. Compl. The complaint alleges four causes of action: (1) a 42 U.S.C. § 1983 claim for violation of the First Amendment, against all defendants; (2) a whistleblower employment discrimination claim under ORS § 659A.199, against all defendants; (3) a whistleblower employment discrimination claim by a public employer under ORS § 659A.203, against Washington County; and (4) an employment discrimination claim based on initiating or aiding in criminal or civil proceedings under ORS § 659A.230, against all defendants. Compl. 17-23.

Defendants moved for summary judgment on June 2, 2025. Defs. Mot. for Summ. J. ("Defs. Mot."), ECF 42. Plaintiff responded in opposition on July 15, 2025. Pl. Resp. Defendants replied on

August 7, 2025, wherein defendants also lodged evidentiary objections to evidence relied upon in plaintiff's response.  Defs. Reply, ECF 53, at 5.  Plaintiff filed a sur-reply addressing defendants' evidentiary objections on August 14, 2025.  Pl. Sur-Reply, ECF 54.

## DISCUSSION

As noted, defendants have filed evidentiary objections in addition to their motion for summary judgment.  The Court addresses these objections first and then turns to the substance of defendants' motion, which seeks summary judgment on all four of plaintiff's claims.

### A.    Evidentiary Objections

Defendants object to four documents plaintiff submitted in support of his opposition, all of which are attached to the confidential declaration of plaintiff's counsel, as follows: (1) plaintiff's notes about his discussions with Cmdr. Bennett and Lt. Noffsinger, found at Exhibit 3, page 6; (2) plaintiff's notes presented with his March 7, 2022 letter to Shf. Garrett, found at Exhibit 9, pages 15-24; (3) plaintiff's March 18, 2022 email to Shf. Garrett, found at Exhibit 10, pages 2-3; and (4) plaintiff's April 5, 2022 letter to Shf. Garrett, found at Exhibit 12.  *See* Mittendorf Confid. Decl. Exs. 3, 9, 10, 12.  Defendants argue that these documents should not be considered on summary judgment because they are inadmissible as presented and contain inadmissible hearsay.  Defs. Reply 5.  Plaintiff disputes these objections.

Beginning with inadmissibility, it is immaterial whether the documents are admissible as presented. Defendants cite a 2002 case to claim that a court may only consider admissible evidence on summary judgment.  *See* Defs. Reply 5 (citing *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002)). While that was once true, the rule was changed in 2010 when Federal Rule of Civil Procedure 56 was revised.  *See Harlow v. Chaffey Cmty. Coll. Dist.*, No. 21-55349, 2022 WL 4077103, at *1 (9th Cir. Sept. 6, 2022) (explaining that the district court erred by relying on "*Orr*'s interpretation of Rule 56 before the 2010 amendments"); *see also* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments.  Rule 56 now provides that courts must consider evidence that may "be presented in a form that would be admissible" at trial, even if it is not presented in an admissible form at summary judgment.  Fed. R. Civ. P. 56(c)(2); *see Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (holding that evidence "presented at the

summary stage does not yet need to be in a form that would be admissible at trial" so long as it satisfies the requirements of Rule 56). The Court therefore overrules defendants' admissibility challenges and turns to defendants' individual hearsay objections.

*Plaintiff's March 7, 2022 Notes.* Plaintiff's notes are inadmissible hearsay—and, for the most part, double hearsay, as they contain what appear to be quotes from other persons. *See* Mittendorf Confid. Decl. Ex. 3 at 6; *see also United States v. Arteaga*, 117 F.3d 388, 396 n.12 (9th Cir. 1997), *op. am. on denial of reh'g* (July 23, 1997). The Court does not see how these notes could be used for a non-hearsay purpose. While the overall exhibit containing these notes may be considered, the notes themselves may not. Defendants' objection as to Exhibit 3, page 6, is sustained.

*Plaintiff's March 18, 2022 Notes.* The notes plaintiff attached to his letter to Shf. Garrett, *see id.* at Ex 9 at 15-24, may be considered to show their effect on the reader. *See L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935, *op. am. on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002) ("Out-of-court declarations introduced to show the effect on the listener are not hearsay."). These notes detail plaintiff's complaints regarding the investigative findings and thus may be considered to show their impact on Shf. Garrett and any other person involved in reviewing the investigation. *See* Mittendorf Confid. Decl. Ex. 9 at 15-24. The notes may also be considered to establish the fact that the notes were sent to Shf. Garrett. The Court will not, however, read the notes for the truth of the statements asserted therein. Defendants' objection as to Exhibit 9, pages 15-24 is overruled.

*Plaintiff's March 18, 2022 Emails.* Plaintiff's emails to Shf. Garrett may again be considered for their effect on the reader. In the emails, plaintiff complains about Chief Dep. McCrea's email and about a general lack of communication. *Id.* at Ex. 10 at 3. Those statements may likewise be considered for their impact on the reader, and to show the fact that the emails were sent, but not for the truth asserted therein. Additionally, plaintiff describes his emotional state after reading Cmdr. McCrea's email. *See id.* ("I am shocked, angry, frustrated, anxious, stressed, embarrassed, and hurt."). Those statements may separately be considered under the present mental condition exception to the hearsay rule. *See* Fed. R. Evid. 803(3). Defendants' objection as to Exhibit 10, pages 2-3 is overruled.

***Plaintiff's April 5, 2022 Letter.*** Finally, plaintiff's resignation letter, Mittendorf Confid. Decl. Ex. 12, may appropriately be considered for its effect on the reader. This letter may also be considered as a legally operative document providing plaintiff's tender of resignation. *See Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1154 (9th Cir. 2000) (explaining "a legally operative document that defines the rights and liabilities of the parties" is "excluded from the definition of hearsay and is admissible evidence"). Otherwise, the Court will not consider the document for the truth asserted therein. Defendant's objection to Exhibit 12 is overruled.

**B.    Summary Judgment**

As noted, defendants seek summary judgment on all four of plaintiff's claims. All four claims—one for First Amendment retaliation and three for Oregon state law whistleblower retaliation—share a common element: the existence of an adverse employment action or decision. Accordingly, the Court begins its analysis of defendants' motion by examining (1) plaintiffs' theories for such adverse actions; and then considers the remaining elements required for (2) the First Amendment retaliation claim, and (3) the Oregon state law whistleblower retaliation claims.

1.    *Adverse Employment Action*

All of plaintiffs' claims depend on the existence of an adverse employment action or decision. *See Greisen v. Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019) (describing First Amendment retaliation claim elements); *Hall v. State*, 274 Or. App. 445, 453, 366 P.3d 345 (2015) (noting adverse employment action element in ORS section 659A.199, 659A.203, and 659A.230 claims). Plaintiff argues that he suffered five adverse actions: (1) constructive discharge; (2) the SRIM investigation; (3) the reassignment; (4) the oral reprimand; and (5) Chief Dep. McCrea's email posting the temporary PSU position. Pl. Resp. 23-24. As discussed further below, plaintiff has not shown that he was constructively discharged. However, he has shown that the SRIM investigation, reassignment, and oral reprimand constitute adverse employment actions. The position posting does not.

a.    Constructive Discharge

Plaintiff has not shown that he was constructively discharged.[6]  Constructive discharge may be found when the "working conditions [are] so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004).  The standard is objective; "the plaintiff need not show that the employer subjectively intended to force the employee to resign."  *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987).  The "totality of [the] circumstances" must instead demonstrate that "a reasonable person in [the employee's] position would have felt . . . forced to quit because of intolerable and discriminatory working conditions."  *Id.* (citation and quotation marks omitted).  It is insufficient under this analysis to show a "single isolated instance" supporting constructive discharge.  *Id.* (citation and quotation marks omitted).  A plaintiff must instead "show some aggravating factors, such as a continuous pattern of discriminatory treatment."  *Id.* (citation modified).  "Demotions, pay cuts, unwarranted disciplinary actions, and encouragement to 'resign or retire' may support the contention that an individual was constructively discharged."  *Fleming v. City of Boise*, No. 24-7100, 2025 WL 2837734, at *1 (9th Cir. Oct. 7, 2025) (emphasis omitted) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1412 (9th Cir. 1996)).  For state law claims, a plaintiff must additionally demonstrate that "the employer intentionally created or intentionally maintained" the intolerable working conditions.  *McGanty v. Staudenraus*, 321 Or. 532, 557, 901 P.2d 841 (1995).

Plaintiff argues that he was constructively discharged because he was effectively demoted to a position he held years prior; because defendants "broadcast[ed]" plaintiff's personal life and work reassignment to plaintiff's peers, causing plaintiff humiliation and isolation; and because defendants' actions would cause plaintiff to lose respect and authority amongst his peers if he were to stay on in his position.  Pl. Resp. 17.  Defendants argue these are merely subjective anticipatory concerns that do not support plaintiff's contention.  Defs. Reply 6-7.

Even if the Court were to consider plaintiff's reassignment as a demotion, a demotion is

---

[6] Plaintiff's opposition speaks of "Plaintiff's Constructive Discharge Claim."  Pl. Resp. 16 (emphasis omitted).  However, the complaint does not allege a standalone claim for constructive discharge.  *See* Compl. 17-23.  The constructive discharge allegations are therefore discussed in the context of plaintiff's pleaded claims.

"insufficient, as a matter of law, to establish a constructive discharge." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (finding a cross-country transfer and demotion to a nonsupervisory position did not amount to constructive discharge). Plaintiff argues that his demotion was aggravated by defendants isolating and humiliating plaintiff. *See* Pl. Resp. 17. Humiliation and isolation may, in certain circumstances, create intolerable working conditions. *See Suders*, 542 U.S. at 134; *see also Wheeler v. Home Depot USA, Inc.*, 794 F. App'x 617, 619 (9th Cir. 2019). Those circumstances have not been demonstrated here.

Plaintiff's humiliation argument centers around two emails: the email Sgt. Morris sent to the WCSO sergeants and the email Chief Dep. McCrea sent posting a temporary opening with PSU. Sgt. Morris's email shared that BPD had previously conducted an investigation involving plaintiff's daughter and then DHS became involved "to some extent" regarding plaintiff's grandchildren. Mittendorf Confid. Decl. Ex. 2. The email also said that Sgt. Bass requested WCSO to handle the investigation and that this request was denied for presenting a conflict of interest. *Id.* Taken alone, a reasonable officer could be humiliated by having his family's issues shared with his coworkers. However, it is hard to understand how a reasonable officer in plaintiff's position would experience such humiliation. Plaintiff's entire goal was to have WCSO take over the investigation, which would surely mean he intended for WCSO to learn of the investigation. Were WCSO to take over the investigation as plaintiff wanted, the information contained in Sgt. Morris's email would surely have become known, along with much more detailed information about plaintiff's family situation. This email therefore does not present the sort of humiliation or isolation that would compel a reasonable officer in plaintiff's position to resign.

As to the email from Chief. Dep. McCrea, it is unclear that this email even identified plaintiff's situation to his peers. As noted above, plaintiff is included as a recipient on the email, and the email does not state that the open position was once held by plaintiff. *See* Mittendorf Confid. Decl. Ex. 10 at 4. Even if the email did reveal plaintiff's reassignment, it is unclear how that could reasonably be deemed an aggravating factor. It seems the email would only serve to hasten the inevitable; plaintiff's peers would presumably find out about the reassignment when plaintiff began his new position. And while plaintiff

14

may have experienced interpersonal difficulties in that new position, he has not presented evidence showing these difficulties would drive a reasonable employee to resignation. Considered together, the evidence simply does not show that plaintiff's working conditions were "so intolerable and discriminatory that a reasonable person would feel forced to resign." *Schnidrig*, 80 F.3d at 1412 (finding no constructive discharge where the employee was, among other things, replaced as head of the company, not given a new position, and forced to move into a smaller office). Plaintiff has not shown that he was constructively discharged.

              b.        SRIM Investigation

Of course, constructive discharge is not the only adverse employment action plaintiff alleges. An adverse employment action in the retaliation context is "'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.'" *Ray v. Henderson*, 217 F.3d 1234, 1243-44 (9th Cir. 2000) (citation omitted). Both the Ninth Circuit and Oregon courts construe this standard broadly. *See Black v. City & County of Honolulu*, 512 F. App'x 666, 669 (9th Cir. 2013) ("Given our broad understanding of what constitutes an adverse employment action . . ."); *Tomlinson v. Jackson County*, 345 Or. App. 637, 642, 583 P.3d 576 (2025) ("Under state and federal law, the standard is functionally the same." (citing *Summerfield v. Or. Liquor Control Comm'n*, 366 Or. 763, 780-81, 472 P.3d 231 (2020))). "Whether a particular [event or action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (citation and quotation marks omitted). It is the plaintiff's burden to show that a reasonable employee would be deterred by the adverse action. *Id.* at 68.

Internal investigations are frequently found to constitute adverse employment actions under this standard. *See Sherman v. Clackamas Cnty. Sheriff's Off.*, No. 3:21-cv-01005-HL, 2022 WL 2670148, at *10, 12 (D. Or. June 23, 2022), *report and recommendation adopted*, No. 3:21-cv-01005-HL, 2022 WL 2667020 (D. Or. July 8, 2022); *see also Black*, 512 F. App'x at 669. It is true that a SRIM investigation is deemed less serious than a full-fledged internal affairs investigation. *See* Frohnert Dep. 3. But the SRIM

15

investigation was sufficiently serious here to constitute an adverse employment action. Plaintiff was suspended from his PSU duties and put to work on a training manual through the duration of the investigation. He was also made to participate in interviews and saw his behavior subject to scrutiny by his supervisors. Those actions are reasonably likely to deter an employee from speaking out.

>           c.           Reassignment

Plaintiff's reassignment also constitutes an adverse employment action. *See Ray*, 217 F.3d at 1241 (finding a lateral transfer functions as an adverse employment action). Plaintiff was involuntarily returned to a position he held years prior. Losing the PSU role also meant losing what Chief Dep. McCrea described as a "great opportunity . . . to learn more about internal affairs" that could "help prepare" plaintiff for other opportunities within the Sheriff's Office. Mittendorf Confid. Decl. Ex. 10 at 4. Whether viewed as a demotion or a lateral transfer, plaintiff's reassignment was an adverse employment action.

>           d.           Oral Reprimand

Construing the evidence in plaintiff's favor, the oral reprimand also qualifies as an adverse employment action. *See* Mittendorf Confid. Decl. Ex. 7. This is a close call. Reputation damage, "[m]ere threats[,] and harsh words are insufficient" to constitute adverse employment actions. *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998). Applying this logic, the Ninth Circuit has at least once before found that that an oral reprimand that does not alter a plaintiff's job duties and does not enter an employee's personnel file does not qualify. *See Hellman v. Weisberg*, 360 F. App'x 776, 779 (9th Cir. 2009).

In some ways, the situation here is similar. Oral reprimands do not qualify as discipline under WCSO policies. Dep. of Patrick James Garrett ("Garrett Dep."), ECF 43-4, at 5; Frohnert Dep. 4 (explaining that an oral reprimand is not formal discipline). And there is no evidence showing the oral reprimand, which was issued separately to the reassignment, altered plaintiff's job duties in any way. *See* McCrea Dep. 5 (explaining a person can have an oral reprimand and still work in PSU).

However, there is also no evidence showing whether the reprimand would or would not be maintained in plaintiff's personnel file. It was documented, as evidenced by Lt. Frohnert's letter, and stated within that it was given for sustained policy violations. *See* Mittendorf Confid. Decl. Ex. 7. Construing

16

the facts in plaintiff's favor, this documentation may be seen as maintaining the reprimand within plaintiff's personnel records. Within the hierarchal environment of a sheriff's office, an oral reprimand that is documented within an officer's personnel records could deter a reasonable employee from speaking out. Accordingly, under the broad standard for a retaliatory adverse employment action, the oral reprimand qualifies as well.

e.    Position Posting

On the other hand, Chief Dep. McCrea's email announcing the temporary PSU position opening does not qualify as an adverse employment action. *See* Mittendorf Confid. Decl. Ex. 10 at 4. As discussed above, there is no evidence that email revealed any information about plaintiff's situation and, even if it did, that it revealed anything that would not be soon discovered anyway. At most, the email may have caused plaintiff some reputational harm—but that is insufficient on its own to constitute an adverse employment action. *See Nunez*, 147 F.3d at 875.

\* \* \*

In total, plaintiff has shown three adverse employment actions: the SRIM investigation, the reassignment, and the oral reprimand. Plaintiff has not shown that he was constructively discharged or that the position posting constituted an adverse employment action.

2.    *First Amendment Retaliation Claim*

Having determined that plaintiff faced adverse employment actions, the Court next turns to the remaining elements of plaintiff's First Amendment retaliation claim. First Amendment retaliation claims against government employers are analyzed "under the two-step *Pickering* framework." *Thompson v. Cent. Valley Sch. Dist. No 365*, 163 F.4th 654, 662 (9th Cir. 2025) (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). The Ninth Circuit distilled that framework into a five-step test, which asks:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse

17

employment action even absent the protected speech.

*Burch v. City of Chubbuck*, 146 F.4th 822, 832 (9th Cir. 2025) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)).

"The first two steps—whether the plaintiff spoke on a matter of public concern, and if so, whether that speech was made as a private citizen or as a public employee—form the lodestar question of whether the plaintiff's speech is protected under the First Amendment." *Id.* It is the plaintiff's burden to establish both these and the third step. *Id.* If the plaintiff establishes that his speech was protected and that he faced an adverse employment action that was motivated by said speech, then the burden shifts to the government employer to demonstrate the fourth and fifth steps. *Id.* "Only if the government fails *both* the fourth and fifth steps does the plaintiff establish a First Amendment violation." *Id.* (emphasis in original). This framework requires a "fact-sensitive and deferential weighing of the government's legitimate interests" against the employee's interests in the challenged speech. *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 677 (1996).

As described further below, while plaintiff has shown that he spoke on a matter of public concern, he has shown no genuine disputes of material fact as to whether he spoke as a private citizen. Additionally, even if he could establish the first three steps of the *Pickering* framework, his claim would fail at the balance of interests analyzed at step four. Summary judgment is therefore appropriate on this claim.

a.    Matter of Public Concern

Plaintiff's First Amendment retaliation claim is predicated on his conversation with Sgt. Finch. *See* Compl. ¶ 63, 65-70. Thus, the threshold question "is whether the statements" plaintiff made to Sgt. Finch "substantially address a matter of public concern." *Roe v. City and County of San Francisco*, 109 F.3d 578, 584 (9th Cir. 1997) (citing *Allen v. Scribner*, 812 F.2d 426, 430, *as am.*, 828 F.2d 1445 (9th Cir. 1987)). Courts consider "the content, form, and context of a given statement, as revealed by the whole record" to determine whether challenged speech is on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). This assessment is made "at the time of publication." *City of San Diego v. Roe*, 543 U.S.

18

77, 84 (2004) (per curiam).  The Court considers the content, form, and context of plaintiff's statements in turn.

<i>i.      Content</i>

Content is "the greatest single factor" in the inquiry.  *Havekost v. United States Dep't of Navy*, 925 F.2d 316, 318 (9th Cir.1991) (quoting *Johnson v. Multnomah Cnty., Or.*, 48 F.3d 420, 424 (9th Cir. 1995)).  Content that involves "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication" is protected.  *City of San Diego*, 543 U.S. at 83-84.  This is a "low bar," *Burch*, 146 F.4th at 833, but it is not bottomless, *see Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009).  Speech concerning purely personal interests, "such as speech addressing a personal employment dispute or complaints over internal office affairs, ordinarily is not entitled to constitutional protection in the employment context."  *Adams v. County of Sacramento*, 143 F.4th 1027, 1035 (9th Cir. 2025) (citation modified).  Additionally, statements "made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern" when the subject matter at issue "is only marginally related to issues of public concern."  *Desrochers*, 572 F.3d at 710 (citations and quotation marks omitted).  "'The focus'" of this inquiry is on "'whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance.'"  *Adams*, 143 F.4th at 1035 (quoting *Roe*, 109 F.3d at 584).  When speech touches on a controversial topic of general interest, such as racism or religious discrimination, "speech that complains of only private, out-of-work, offensive individual contact by unknown parties" does not necessarily involve a matter of public concern.  *Id.*  Speech that addresses the topic generally does.  *Id.*

The content of plaintiff's speech sufficiently touches on a matter of public concern.  At issue are two statements plaintiff made to Sgt. Finch: that BPD was "class-less" in handling his daughter's arrest and that the police report resulting from that arrest was "shit."  According to plaintiff, these statements concerned BPD's ability to handle child abuse and domestic incidents appropriately.  Pl. Resp. 16.  According to defendants, plaintiff spoke about a personal grievance borne out of a private family event.

19

Defs. Mot. 21. Both are right. Plaintiff's statements fall comfortably in the grey area between public and private.

Child abuse and domestic violence are surely matters of public interest. How police handle these matters is surely also of great interest to the public. How police might have handled one specific incident is less interesting, but it is still of some import. Members of the public may be interested in how their police department handled a single incident of domestic violence, including whether it was handled with class. Members of the public may also care about how their police officers documented this incident. While it is true that plaintiff's statements grew out of a private interest that could even be construed as a grudge, plaintiff's statements do not "only marginally relate[] to issues of public concern." *See Desrochers*, 572 F.3d at 710 (citation and quotation marks omitted). Nor did plaintiff's speech complain "of only private, out-of-work" conduct—they concern how BPD engaged externally with a member of the public, plaintiff's daughter. *Adams*, 143 F.4th at 1035. That takes plaintiff's statements out of the purely private sphere.

It is of no importance to this analysis that plaintiff's speech was crass: "The inappropriate or controversial character of a statement is irrelevant to the question [of] whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987). "[D]istatestful character alone does not strip" speech that is otherwise of public interest "of all First Amendment protection." *Hernandez v. City of Phoenix*, 43 F.4th 966, 978-79 (9th Cir. 2022). The content of plaintiff's speech addresses a matter of public concern.

### ii.    Form

Form is a closer call, but it does not negate the public importance of plaintiff's speech. Plaintiff made the statements at issue during a private phone call with Sgt. Finch. *See* Bass Dep. 7. Plaintiff did not make these statements to the press or otherwise broadcast them publicly. It seems plaintiff had no intent of anyone other than Sgt. Finch ever hearing the words "class-less" and "shit." *See Anderson*, 143 F.4th at 1038 (mentioning that the plaintiff "intended for the messages to remain private, as they only resurfaced when the recipients revealed them years later"). Plaintiff's statements only came to light when they were revealed as part of the SRIM investigation.

However, plaintiff also did not make these statements internally to his coworkers, but rather, to a sergeant from an outside police department. Even in situations where the plaintiff does speak only to a coworker as opposed to an outside audience, the "'limited circulation' of speech 'is not, in itself, determinative.'" *Id.* at 1037 (quoting *Jensen v. Brown*, 131 F.4th 677, 688 (9th Cir. 2025)); *see Rankin*, 483 U.S. at 381-82, 386 (finding that a remark made only to the plaintiff's coworker addressed a matter of public concern). Ultimately, the form of plaintiff's speech here does not move the needle in either direction. "Although the audience to whom a public employee's speech is addressed may be instructive," plaintiff's limited audience does not temper the public value of plaintiff's statements here. *Jensen*, 131 F.4th at 688.

### iii.    Context

Context does not move the needle either. Plaintiff made these statements while trying to get his family's case transferred from BPD to WSCO. That is certainly personal; plaintiff did not try to get BPD to stop all child abuse investigations or try to modify the way BPD handles domestic incidents. But it is still of public concern that a sergeant so strongly disbelieved in the abilities of another department that he wanted them taken off a case. While plaintiff's statements may have been "essentially self-interested," they were not "with[out] public import." *Roe*, 109 F.3d at 585. Taken together, plaintiff's statements address a matter of public concern.

### b.    Private Citizen or Public Employee

However, plaintiff's First Amendment retaliation claim must be dismissed because plaintiff spoke as a public employee and not as a private citizen. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). This inquiry is "'practical'" and highly fact-intensive. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013) (quoting *Garcetti*, 547 U.S. at 424-25). In *Dahlia*, the Ninth Circuit laid out three "guiding principles" that, while not dispositive, can help in making this assessment. 735 F.3d at 1074-75. The first is whether "the employee confined his communications to the chain of command," a factor that is of particular importance "in a highly hierarchal employment setting such as law enforcement."

*Id.* at 1074. The second is the subject matter of the communication. *Id.* at 1074-75. For example, "a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence" is typically made within the employee's job duties. *Id.* at 1075 (citing *Garcetti*, 547 U.S. at 421)). The third factor concerns whether the public employee spoke "in direct contravention to his supervisor's orders," in which case "that speech may often fall outside of the speaker's professional duties." *Id.*

The Court first considers defendants' argument that plaintiff's speech was invariably made as a public employee because it fell within plaintiff's mandatory reporting duties. The Court then turns to the principles identified in *Dahlia*.

### i.    *Public Reporter Duties*

Defendants argue that the Court need not wade into the *Dahlia* guidelines at all because plaintiff's speech fell squarely within his job duties because plaintiff was a mandatory reporter. *See* Defs. Reply 7-8. Under that line of reasoning, plaintiff's speech must have begun when he reported the suspected child abuse to DHS and the WCSO non-emergency line on December 11, 2021.

It is undisputed that plaintiff reported his suspicions of child abuse and that his job required him to make such reports. If plaintiff's retaliation claims were based on this reporting, the answer would be easy. Oregon law requires police officers and sheriff's deputies to report child abuse, *see* Or. Rev. Stat. §§ 419B.010, 419B.005, and numerous courts have found that mandatory reporters speak as public employees when they make mandated reports, *see, e.g.*, *Parker v. Sch. Dist. of Philadelphia*, 415 F. Supp. 3d 544, 559 (E.D. Pa. 2019), *aff'd*, 823 F. App'x 68 (3d Cir. 2020). However, the record does not show that plaintiff was penalized in any way for making these reports.

Nor does the record show a sufficiently close nexus between plaintiff's report and the challenged statements he made to Sgt. Finch. It is true that Sgt. Finch called plaintiff in response to plaintiff's reporting. *See* Bass Dep. 7. But the statements at issue did not concern the suspected child abuse or plaintiff's reporting more generally. Rather, plaintiff made remarks about how BPD handled a prior, separate domestic incident. And plaintiff was subsequently found to have violated professional conduct and courtesy rules based on these specific statements. *See* Mittendorf Confid. Decl. Ex. 9 at 7. It is too tenuous to say

22

that plaintiff's statements to Sgt. Finch were made under plaintiff's mandatory reporting duties. The Court thus turns to the *Dahlia* guidelines to assess whether plaintiff spoke as a public employee or private citizen.

### ii.    Dahlia *Principles*

***Chain of Command.***  "[W]hen a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job, although it is not dispositive that a public employee's statements are made internally." *Dahlia*, 735 F.3d at 1074 (citation and quotation marks omitted). "If however a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Id.* (citation and quotation marks omitted).

There is no question that Sgt. Finch, at BPD, fell outside of plaintiff's chain of command at WCSO. But that is not where this inquiry ends. Bearing in mind the Ninth Circuit's instruction "that various easy heuristics are insufficient for determining whether an employee spoke pursuant to his professional duties," the Court considers the context underlying plaintiff's relationship with Sgt. Finch. *Id.* at 1069.

Plaintiff's statements to Sgt. Finch arise from plaintiff's attempt to transfer his family's incident investigation from BPD to WCSO. When plaintiff reported the suspected child abuse, he asked the dispatcher if the incident could be referred from BPD to WCSO. Compl. ¶ 28. When Sgt. Finch returned plaintiff's call, plaintiff again said that he wanted the incident to be transferred to WCSO. Bass Dep. 7; Mittendorf Confid. Decl. Ex. 4 at 4. When plaintiff made the remarks in question, he did so to explain why he wanted the incident transferred to his own jurisdiction. *Id.* at Ex. 4 at 6. Sgt. Finch then told plaintiff he would discuss plaintiff's request with his lieutenant and would ask whether the matter could be transferred to a separate department. Bass Dep. 7.

Sgt. Finch was therefore not in plaintiff's chain of command, however, plaintiff still spoke to Sgt. Finch within *a* chain of command. Plaintiff attempted to pursue his goal through Sgt. Finch, who in turn acted within his chain of command in addressing plaintiff's request. Sgt. Finch also raised plaintiff's request through plaintiff's own chain of command, as evidenced by Sgt. Morris's follow-up email. *See*

23

Mittendorf Confid. Decl. Ex. 2 (informing WCSO sergeants that he spoke with Sgt. Finch about plaintiff's request). And plaintiff raised his request in parallel through his own chain of command as well. *See* Compl. ¶ 37. What plaintiff did not do was share his concerns about BPD's investigation with anyone outside a chain of command that could effectuate plaintiff's internal employee-specific goal of having his family's incident transferred to his jurisdiction. On balance, this guideline points towards plaintiff speaking as a public employee.

*Subject Matter.* The subject matter of plaintiff's statements presents a tricky question. Taking plaintiff's words at face value, their subject matter appears to fall outside of plaintiff's work. Criticizing another department's work is certainly not "a routine function" of plaintiff's role as a WCSO sergeant. *Burch*, 146 F.4th at 835. It is also not within plaintiff's job duties to assess BPD's handling of an outside incident. But speaking with outside agencies is routine and, in fact, central to plaintiff's work as a member of the PSU. *See* McCrea Dep. 4; Garrett Dep. 4. Managing investigations is also a routine part of a sergeant's job. *See* McCrea Dep. 4.

Taking plaintiff's words in context is another story. Plaintiff made these statements not to expose broad abuse at BPD, but to reason why the investigation should be transferred to his own jurisdiction. Numerous officers found that request presented a conflict of interest. *See* Mittendorf Confid. Decl. Ex. 4 at 4. It cannot be said, then, that this wrongful request was made "pursuant to normal departmental procedure." *Dahlia*, 735 F.3d at 1075. But can it be said that the request was made as a private citizen? Plaintiff made the request in an attempt to influence an investigation and, specifically, to move an investigation to his own jurisdiction. Private citizens may be able to request jurisdictional transfers, but they assuredly cannot request transfers to the jurisdiction where they work. Only public employees have that ability—even if the ability is one that should not be used. And while plaintiff claimed to be speaking to Sgt. Finch as a father, Sgt. Finch somehow came to know of plaintiff's position during the conversation because Sgt. Finch suggested transferring the case specifically to a department in which plaintiff did not work, and because Sgt. Finch followed up with plaintiff's superiors at BPD after the call ended. Mittendorf Confid. Decl. Ex. 4 at 4. Even though plaintiff told Sgt. Finch he was speaking as a father, plaintiff's role

24

as a WCSO sergeant cannot be ignored or filtered out from the conversation; a WCSO sergeant asking for a case to be transferred to WCSO is likely to be treated differently than a transfer request coming from a private citizen.  This difference was borne out in Sgt. Finch's suggestion to see whether the matter could be transferred to Hillsboro or Tigard—transfers that would only be needed to avoid the conflict of interest at WCSO.  *See* Bass Dep. 7.

While plaintiff's statements were not made in the course of his routine duties, that is because they presented a conflict of interest.  Plaintiff's statements did not "bring up any allegation of corruption or other serious misconduct" that plaintiff saw generally in BPD.  *Brandon v. Maricopa County*, 849 F.3d 837, 845 (9th Cir. 2017).  Plaintiff complained only of misconduct he perceived in his daughter's earlier case to explain why he wanted the present case transferred to his own jurisdiction.  That request may have been unreasonable and thus outside of plaintiff's appropriate duties, but it was a request uniquely made through plaintiff's role as a WCSO sergeant.

***Contravention to Supervisor's Orders.***  Finally, plaintiff's statements were not made in direct contravention to his supervisor's orders.  Although plaintiff was later reprimanded for his remarks, he did not go against any order when he made the marks.  It is true that plaintiff violated general policies about collegiality and respect, but even This guideline again weighs against protection.

Considering the three identified guidelines, as well as the general context surrounding plaintiff's statements, the Court's "'practical inquiry' shows that there is no genuine dispute that [plaintiff's] speech was made pursuant to [his] official duties" as a WCSO sergeant, "rather than as a private citizen." *Burch*, 146 F.4th at 836 (quoting *Garcetti*, 547 U.S. at 424).

c.      Balance of Interests

Even if plaintiff's speech were protected, his claim would still fail because WCSO's "administrative interests outweigh [plaintiff]'s right to engage in the expressive activity at issue." *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1138 (9th Cir. 2025) (citing *Umbehr*, 518 U.S. at 677). "As with any balancing test requiring the weighing of competing interests, no hard-and-fast rules dictate where the balance is to be struck in a particular case." *Hernandez*, 43 F.4th at 976.  On one hand,

25

"government employees have an interest in speaking out to bring to light actual or potential wrongdoing or breach of public trust within their agencies, since they are often uniquely situated to inform the public about government corruption and abuse." *Id.* at 976-77 (citations and quotation marks omitted). On the other, "government employers have a strong interest in prohibiting speech by their employees that impairs close working relationships among co-workers, impedes performance of the speaker's job duties, interferes with the effective functioning of the employer's operations, or undermines the employer's mission." *Id.* at 976. This test "'recognizes that a government employer has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.'" *Thompson*, 163 F.4th at 663 (quoting *Moser v. L.V. Metro. Police Dep't*, 984 F.3d 900, 906 (9th Cir. 2021)).

At the "'apex'" of First Amendment protection lies "political speech that addresses problems at the government agency where the employee works." *Id.* at 664 (quoting *Moser*, 984 F.3d at 906). When that speech is "derogatory in nature," it maintains some First Amendment protection, but it may also fall to a lesser rung. *Id.* Additionally, speech may be afforded less protection when it "touches on a matter of public concern as a whole, but is unrelated to an individual's workplace or expertise." *Id.*

Plaintiff's speech falls within the latter category. It touched generally on matters of public interest, but it did not relate specifically to plaintiff's "individual[] workplace" or "address[] problems at the government agency where [plaintiff] works." *Id.* Plaintiff spoke instead about issues he perceived with a separate agency's handling of a specific incident. That does not lie at the apex of First Amendment protection.

Additionally, plaintiff's speech was somewhat crass and derogatory, albeit far less harsh than much of the derogatory language addressed in prior cases. *See, e.g.*, *id.* at 664-65 (finding the plaintiff's "use of disability-related slurs . . . and . . . violent language suggesting taking individuals 'to the woodshed for a proper education' [were] not speech entitled to the highest constitutional protection"); *Hernandez*, 43 F.4th at 973-74 (showing the challenged speech involved derogatory and inflammatory comments about Muslims). Though less extreme, reasoning from those cases still offers helpful guidance here. In

26

*Thompson*, the Ninth Circuit explained that the derogatory slurs used was due less protection because it was not "based on insight [the plaintiff] had gained into" his place of employment's system while acting as a public employee. 163 F.4th at 664-65. The plaintiff's interests in this speech were ultimately afforded little weight because the "slur was not comparable in speech value to comments of [public employees] that are based on knowledge they gained" in their work. *Id.* at 665. As in *Thompson*, plaintiff's speech was not based on knowledge he gained in his work and did not offer insight into WCSO. Plaintiff's interests in his speech are thus somewhat muted.

At the same time, "a police department's determination that an officer's speech warrants discipline is afforded considerable deference, and police departments may permissibly consider the special status officers occupy in the community when deciding what limitations to place on officers' off-duty speech." *Hernandez*, 43 F.4th at 979 (citations omitted). As a member of the PSU—the Professional Services Unit— plaintiff held a particularly special status. The PSU regularly engages with outside organizations and, as evidenced by the name, is expected to exhibit a certain level of professionalism. *See* McCrea Dep. 4; Garrett Dep. 4. Given the special position occupied by PSU, defendants have shown "reasonable predictions" that plaintiff's speech would cause "disruption in the workplace" and, thus, have shown that their interests outweigh plaintiff's. *Thompson*, 163 F.4th at 665 (citation and quotation marks omitted). As plaintiff's speech does not occupy the apex of First Amendment protection, it is immaterial that defendants have not demonstrated actual disruption. *See Nichols v. Dancer*, 657 F.3d 929, 934 (9th Cir. 2011). Defendants have reasonably shown that plaintiff's speech could impede WCSO's ability to work respectfully and cohesively with its sister departments and that it could therefore disrupt WCSO's regular operation. *See Damiano*, 140 F.4th at 1138. Altogether, WCSO has shown that its interests outweighed plaintiff's right to engage in the challenged speech. Summary judgment is therefore appropriate as to the First Amendment retaliation claim.

> d.     Qualified Immunity

Because plaintiff's First Amendment rights were not violated, the individual defendants are also entitled to qualified immunity. *See Thompson*, 163 F.4th at 667.

3.    *State Whistleblower Claims*

Defendants next challenge plaintiff's three claims for whistleblower retaliation under Oregon state law.  While related, each claim challenges "distinct but overlapping categories of protected activities." *Reyna v. City of Portland*, 769 F. Supp. 3d 1161, 1175 (D. Or. 2025), *recons. denied*, No. 3:21-cv-01839-AR, 2025 WL 892959 (D. Or. Mar. 24, 2025).  Section 659A.199 protects an employee's reporting of information when the employee "subjectively believes is a violation of a state or federal law, rule, or regulation and has a good faith basis for that belief." *Boyd v. Legacy Health*, 318 Or. App. 87, 98-99, 507 P.3d 715 (2022).  This section "applies a subjective, good faith standard to employees who report perceived violations of the law." *Id.* at 98.

Section 659A.203, on the other hand,

prohibits any public or nonprofit employer from taking disciplinary action against an employee for disclosing any information that the employee reasonably believes is evidence of a violation of any federal, state or local law, rule or regulation by the public or nonprofit employer or mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the public or nonprofit employer.

*McClusky v. City of N. Bend*, 332 Or. App. 1, 23, 549 P.3d 557 *rev. denied*, 372 Or. 812, 558 P.3d 850 (2024) (cleaned up).  The standard for a Section 659A.203 claim is "more demanding" and the protections narrower than under Section 659A.199.  *See id.* at 23-24 (citation and quotation marks omitted).  Public employees must have an "objectively reasonable belief that the public entity [] engaged in unlawful conduct" to bring a Section 659A.203 claim.  *Hall v. State*, 274 Or. App. 445, 453-54, 366 P.3d 345 (2015).  Section 659A.203 does not apply to "reports of alleged violations or inappropriate conduct by any public or nonprofit employer; by its terms, ORS 659A.203(1)(b) expressly applies only to reports of illegal and other inappropriate conduct by the public or nonprofit employer who takes the adverse employment action." *McClusky*, 332 Or. App. at 24.

Finally, Section 659A.230, in relevant part, protects employees from facing retaliation who have in good faith  "reported criminal activity by any person, . . . caused a complainant's information or complaint to be filed against any person, . . . cooperated with any law enforcement agency conducting a

28

criminal investigation, . . . or [] testified in good faith at a civil proceeding or criminal trial." Or. Rev. Stat. § 659A.230(1). Like Section 659A.199, Section 659A.230 requires only a "subjective, good faith" belief from the employee. *Hall*, 274 Or. App. at 453. "[G]ood faith relates to what the employee knew at the time of the report, not to what might be shown later to be reasonable with the benefit of hindsight." *Id.* at 452.

To establish a prima facie case for retaliation under theses statutes, "the plaintiff must show (1) [he] was engaging in a protected activity, (2) [he] suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision.'" *Huitt v. Optum Health Servs.*, 216 F. Supp. 3d 1179, 1190 (D. Or. 2016) (cleaned up). Causation may be established by showing that the protected activity was a "substantial factor" motivating the adverse employment action. *Id.* (citation and quotation marks omitted). "If the plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the inference of retaliation by offering a legitimate, nondiscriminatory reason for the employee's termination." *Id.* (italics omitted). Then, "[i]f the defendant successfully rebuts the inference of retaliation, the burden shifts back to the plaintiff to show that the defendant's explanation is pretextual." *Id.*

Plaintiff has not established a prima facie case under any of these statutes.[7]

a.    Whistleblower Claim Under ORS § 659A.199

Plaintiff has not established a prima facie case for retaliation under Section 659A.199. Plaintiff argues that he suffered three violations based on three separate instances of protected activity. Only one of those activities is protected under the statute. However, plaintiff has not shown any genuine dispute of material fact as to whether that activity is causally linked to any adverse employment decision.

First, plaintiff raises the December 12, 2021 letter he sent to Yee complaining about the email Sgt.

---

[7] Plaintiff's whistleblower claims must also be dismissed against the individual defendants because these statutes apply only to a plaintiff's employer and not to individual supervisors. *See Ballinger v. Klamath Pac. Corp.*, 135 Or. App. 438, 452, 898 P.2d 232 (1995) (defining employer); Or. Rev. Stat. § 659A.199 (applying to "an employer"); *id.* at § 659A.203 (applying to "any public or nonprofit employer"); *id.* at § 659A.230 (applying to "an employer"). Plaintiff does not dispute that his only employer was Washington County.

29

Morris sent notifying the other sergeants about plaintiff's situation. *See* Mittendorf Confid. Decl. Ex. 3 at 1. Plaintiff argues that this email violated WCSO's basic privacy standards, but he does not show that he reasonably believed it violated any "state or federal law, rule, or regulation." Or. Rev. Stat. § 659A.199. Accordingly, the letter is not protected under Section 659A.199.

Second, plaintiff argues that he engaged in protected activity when he complained to Cmdr. Bennett in December 2021 about WCSO's refusal to take over the investigation into his family's incident. However, plaintiff testified at deposition that the believed WCSO's decision likely violated only "internal policies most likely." Bass Dep. 8. Once again, plaintiff does not show he had a good faith belief that WCSO's refusal to take over BPD's case constituted a violation of any law, rule, or regulation.

Third and finally, plaintiff argues that his March 7, 2022 letter to Shf. Garrett is protected under the statute because it reported unlawful retaliation. Plaintiff has sufficiently shown that he believed in good faith that the alleged retaliation he complained of violated Oregon state law. The letter is protected activity under the statute.

However, plaintiff has not shown a causal link between this protected activity and an adverse employment action. Plaintiff sent his letter to Shf. Garrett on March 7, 2022. All of the adverse employment actions occurred *before* this date. *See Ramsey v. City of Philomath*, 182 F. App'x. 678, 680 (9th Cir. 2006) ("Where the decision to take an adverse employment action is made prior to any protected activity, no factfinder could find the requisite causal link between the employment action and the protected conduct."); *see also Huitt*, 216 F. Supp. 3d at 1193 (finding no causation where the alleged adverse employment decision was made before the employee's whistleblowing activity). The SRIM was initiated on December 15, 2021; Lt. Frohnert decided to reassign plaintiff from PSU to the patrol division on February 9, 2022; and Lt. Frohnert issued an oral reprimand on March 2, 2022. The only event that occurred after plaintiff sent this letter to Shf. Garrett was Chief Dep. McCrea's email to WCSO sergeants about a temporary job opening at PSU. *See* Mittendorf Confid. Decl. Ex. 10 at 4. As discussed above, that email does not constitute an adverse employment action. Taken together, plaintiff has not shown any violations of Section 659A.199.

b.      Public Employer Whistleblower Claim Under ORS § 659A.203

Nor has plaintiff demonstrated any violations of Section 659A.203. As a preliminary matter, plaintiff cannot bring a Section 659A.203 claim based on his reports about BPD and DHS's conduct because Section 659A.203 only applies to reports about a public employee's own employer. *See McClusky*, 332 Or. App. at 24. It is uncontested that plaintiff worked for WCSO and not for BPD or DHS.

Plaintiff argues, however, that a violation should still be found because plaintiff disclosed evidence about WCSO's mismanagement when he emailed Yee, complained to Cmdr. Bennett, and emailed Shf. Garrett. The letter to Shf. Garrett is a nonstarter because, as described above, no adverse employment decisions were made after the letter was sent. The other two activities—the email to Yee and the complaint to Cmdr. Bennett—did not disclose any evidence of "[m]ismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety." Or. Rev. Stat. § 659A.203(1)(b)(B).

"Mismanagement" under Section 659A.203 "refer[s] to wrongful practices that are comparable in magnitude to the other enumerated subjects" in the statute, such as the "gross waste of funds" and the "substantial and specific danger to public health and safety." *Bjurstrom v. Or. Lottery*, 202 Or. App. 162, 171-72, 120 P.3d 1235 (2005). Mismanagement therefore refers to the type of "malfeasance" that "undermines the agency's ability to perform its mission." *Id.* at 172. "[R]outine complaints about policies that employees must implement or practices that employees do not like" do not qualify. *Id.* at 173. Plaintiff's complaints fall into the latter category. Plaintiff disagreed with Cmdr. Bennet's email discussing plaintiff's situation, and he disagreed with WCSO's decision not to take over BPD's investigation into his family's incident. Neither of these present the sort of malfeasance that would undermine WCSO's ability to perform its mission. On the contrary, the record shows that numerous WCSO employees found that it would be a conflict of interest for WCSO to take over BPD's investigation. And it is unclear how the email to plaintiff's colleagues could have caused any harm when plaintiff himself wanted his colleagues to take over the entire investigation. Plaintiff has therefore failed to show any violations of Section 659A.203.

c.      Legal Proceeding Retaliation Claim Under ORS § 659A.230

31

Finally, plaintiff has not demonstrated a Section 659A.230 claim because he has not shown that he faced any adverse employment actions caused by his reporting of criminal activity or cooperation with a law enforcement investigation.[8]

To be sure, plaintiff's reporting of suspected child abuse could qualify under the statute as reporting of criminal activity. But there is simply nothing in the record showing that plaintiff faced any adverse employment decisions because of this report. The record is clear that any adverse actions plaintiff faced were because of his attempt to access data and because of how he spoke with Sgt. Finch when requesting to have the case transferred to WCSO.

Plaintiff also argues that he cooperated with a law enforcement investigation when he tried to have the investigation transferred from BPD to WCSO. Nothing in the record shows that plaintiff cooperated with any investigation; the record shows that plaintiff tried to get WCSO to take on an investigation into his family's incident, and that his attempt failed. Moreover, plaintiff testified at deposition that no investigation had yet begun when he tried to get the incident moved. *See* Bass Dep. 8 (stating that there was "no taking over because nothing had started"). Nothing in the record shows that plaintiff cooperated in any way with a law enforcement investigation. Accordingly, the Section 659A.230 claim fails as well.

## CONCLUSION

Defendants' motion for summary judgment, ECF 42, is GRANTED. This action is DISMISSED with prejudice. Judgment shall follow.


IT IS SO ORDERED.


DATED this 16th day of March, 2026.

_____
Adrienne Nelson
United States District Judge

---

[8] None of the other potential actions listed in the statute apply. Plaintiff did not cause a complaint to be filed against any person, bring a civil proceeding against an employer, nor testify at a civil proceeding or criminal trial. *See* Or. Rev. Stat. § 659A.230.